59   243
85   85

59   243
130   74

[No. 10,585.—In Bank.]

## PEOPLE v. JOHN W. CAMPBELL.

INDICTMENT—CRIMINAL LAW.—The dismissal of an indictment is no bar to another indictment for the same offense.

EX POST FACTO LAW—INFORMATION—CONSTITUTIONAL LAW.—A homicide committed before the adoption of the Constitution of 1879, may after such adoption be prosecuted by information, under the Act of April 9, 1880.

ID.—ID.—ID.—Sharpstein, J., McKinstry, J., and Thornton, J., dissenting, were of opinion to the contrary.

THREATS—HOMICIDE—EVIDENCE—CRIMINAL LAW.—Threats, unaccompanied by acts which threaten the life or limb of the slayer (or of his family), will not justify or excuse a felonious homicide.

*Held*, accordingly, in a trial for murder, that evidence of such threats was properly excluded.

Id.—Id.—Id.—Id.—Sharpstein, J., McKinstry, J., and Thornton, J., dissenting, were of opinion that such evidence was admissible.

Appeal from a judgment of conviction and an order denying a new trial in the Superior Court of San Joaquin County.  Buckley, J., and Paterson, J.

*Terry & McKinne,* and *J. H. Budd,* for Appellant.

*A. L. Hart,* Attorney General, for Respondent.

Morrison, C. J.:

The defendant was prosecuted by information, filed in the Superior Court of San Joaquin County, for the crime of murder, and was found guilty of the crime of manslaughter.

It appears from the record in the case, that the crime with which the defendant was charged, was committed in the month of August, 1879; and before the new Constitution went into effect, an indictment was presented against the defendant by the Grand Jury of San Joaquin County, which indictment was dismissed by the Court, on motion of the District Attorney; and afterwards, to wit, on the 9th day of August, 1880, an information was filed in the case by the District Attorney.  A motion was made to set aside the information, on the ground that the defendant had previously been indicted for the same offense, which motion was denied by the Court.  It was also claimed, on the trial, that the dismissal of the indictment operated as an acquittal, and the plea of former acquittal was interposed on behalf of the defendant.

It is perfectly clear that the dismissal of the indictment was no bar to another indictment for the same offense, and it is equally clear that the defendant never was in jeopardy under the indictment.  But a more serious question is made as to the information, which we will now proceed to examine.

It is claimed that the defendant could not be prosecuted by information because the homicide was committed in August, 1879, at a time when the Constitution then in force provided that "no person shall be held to answer for a capital or otherwise infamous crime   *   *   *   unless on presentment or indictment of a Grand Jury." (Constitution of 1863, Art. i.,

§ 8.) By the Constitution which went into effect on the first day of January, 1880, it is provided that " offenses heretofore required to be prosecuted by indictment shall be prosecuted by information after examination and commitment by a magistrate, or by indictment with or without such examination and commitment, as may be prescribed by law." (Constitution, Art. i., § 8.)

In pursuance of the above constitutional provision, the Legislature passed an act which went into effect on the 9th day of April, 1880, providing that " all public offenses triable in the Superior Courts must be prosecuted by indictment or information, except as provided in the next section" (Penal Code, § 888), and this case does not come within any of the exceptions enumerated in Section 889. The claim on behalf of the defendant is, that neither the Constitution nor the act of the Legislature is applicable to the present case, because, as has already been remarked, the homicide was committed in the year 1879.

We will first consider the question of power, and then the fact of intention. Mr. Cooley in his work on Constitutional Limitations, page 331, says: " But so far as mere modes of procedure are concerned, a party has no more right in a criminal than in a civil action to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the Legislature, and it would create endless confusion in legal proceedings, if every case was to be conducted only in accordance with the rules of practice, and heard only by the Courts in existence when its facts arose. The Legislature may abolish Courts and create new ones, and it may prescribe altogether different modes of procedure, though it cannot lawfully, we think, in so doing, dispense with any of these substantial protections with which the existing law surrounds the person accused of crime. Statutes giving the Government additional challenges, and others which authorized the amendment of indictments, have been sustained and applied to past transactions, as doubtless would be any similar statute, calculated simply to improve the remedy, and in its operation working no injustice to the defendant, and depriving him of no substantial right."

The following examples are given by him in a note to page 332: "The defendant in any case must be proceeded against and prosecuted under the law in force when the proceeding is had." "A law is not unconstitutional which precludes a defendant in a criminal case from taking advantage of remedies which do not prejudice him;" "nor one which reduces the number of the prisoner's peremptory challenges;" "nor one which, though passed after the commission of the offense, authorizes a change of venue to another county;" "nor one which modifies, simplifies, and reduces the essential allegations in a criminal indictment, retaining the charge of a distinct offense." In support of the foregoing legal propositions, numerous authorities are referred to in the note. (See also *People* v. *Mortimer*, 46 Cal. 114.)

It is not an uncommon practice to change the number of Grand Jurors required to investigate criminal charges, but we have never heard of the right of the Legislature to make such changes questioned, neither has it ever been claimed that the charge must be investigated by the *precise* number of Grand Jurors of which that body was composed, at the time the act was committed.

In the case of *Springfield* v. *Hampden Commissioners of Highways*, 6 Pick. 508, the Supreme Court of Massachusetts say: "But there is no such thing as a vested right to a particular remedy. The legislature may always alter the form of administering right and justice, and may transfer jurisdiction from one tribunal to another."

Mr. Bishop, in his work on "Statutory Crimes," lays down the same doctrine. He says: "There is no such thing as a vested right in any particular remedy." (§ 178.)

On principle and authority, we think, there can be no objection to the new remedy prescribed by the Constitution and the act of the Legislature. It was as competent to introduce the prosecution by information and to make the same applicable to past offenses, as it was to establish a new *forum* in which prosecutions for past offenses should take place.

And on the question of intention we are equally clear. The Constitution declares that "all offenses heretofore required to be prosecuted by indictment shall be prosecuted by information after examination and commitment by a magis-

trate, or by indictment with or without such examination or commitment, as may be prescribed by law," and the Act passed to carry into effect the Constitutional provision is, that "all public offenses triable in the Superior Courts must be prosecuted by indictment or information." Neither the Constitution nor the Act of the Legislature, expressly or by legal inference, refers to future offenses only, but the terms of the Constitution, as well as the Act of the Legislature, by their natural import and signification, apply to all prosecutions thereafter to take place, without reference to the time when the act was committed. We can see no good reason why an act previously committed *must be prosecuted* by indictment, and one subsequently committed *may be prosecuted* by indictment or information, and, in our opinion, there is nothing in the provisions referred to which· would justify such a construction. We are, therefore, of opinion that the case is one in which an information was a proper mode of prosecution.

The next question in the case arises out of the refusal of the Court to admit certain evidence offered in behalf of the defense. The evidence offered, and rejected by the Court, consisted of certain threats alleged to have been made by the deceased, which were communicated to the defendant. It will be conceded that threats made by the deceased, when communicated to the defendant, are sometimes competent evidence in his behalf, and in some cases they are admissible, although never communicated. (*People* v. *Arnold,* 15 Cal. 476.)

The evidence was offered for the purpose of establishing a case of justifiable homicide, and its admissibility depends upon the facts and circumstances of the killing. If A. threaten the life of B., this fact will not of itself justify B. in killing A. There must be some act on the part of the person making the threat, from which it appears that there is real or apparent danger of the execution of the threat. Speaking upon this subject, Mr. Wharton, in his work on Criminal Evidence, says: "Can evidence to the effect that the deceased, prior to a homicide, threatened the defendant's life, be received? And if so, is it a prerequisite to the proof of such threats that they should be shown to have been communicated to the defendant? Certainly, if such evidence is

offered to prove that the defendant had a right to kill the deceased, there being no proof of a hostile demonstration by deceased, then it is irrelevant. If A. threatens B.'s life, and this threat is known to B., B.'s duty is to have A. arrested by due process of law, not to shoot him; the right of self-defense being conditioned on an apparent attack. On the other hand, if the question is as to which party in the encounter is the assailant, then it is admissible to prove by the prior declarations of either that the attack was one he intended to make. Threats to this effect by the defendant are always, as has been seen, admissible; and it is properly held that there is equal reason, supposing a collision between the deceased and the defendant to be first proved, for the admission of threats by the deceased." (§ 757.) The text of the learned author on Criminal Evidence is fully sustained by the authorities to which he refers, and they clearly and harmoniously lay down the doctrine that naked threats are not competent evidence, unaccompanied by some act or conduct on the part of deceased showing real or apparent danger of their execution.

· In the case of *Hughey* v. *The State,* 47 Ala. 103, the Court says: "No threats unaccompanied with acts which threaten the life or limb of the slayer, will justify or excuse a felonious homicide. The threats insisted on in this case were not of this character. The Court properly excluded them, as they could have been offered for no other purpose."

In the case of *Evans* v. *The State,* 44 Miss. 770, the Court uses this language: "There is no principle of criminal law better settled—none more necessary to the peace of society and the safety of human life—than that threats, however deliberately made, do not justify an assault and battery, much less the taking the life of the party making them. That is excused when done in the necessary defense of one's own life, or to escape great bodily harm. To shoot down another on sight, and who, at the time, is making no hostile demonstra-
· tion dangerous to life and limb, and especially if not prepared and armed so to do, is, in law, murder. It is murder, because the law tolerates no justification and accepts no excuse for the destruction of human life, on the plea of self-defense, except that the death of the adversary was

necessary, or apparently so, to save his own life, or his person from great bodily injury, and there shall be imminent danger of such design being accomplished. The danger to life, or of great personal injury, must be imminent, present at the time of the killing, real or apparent, and so urgent that there is no reasonable mode of escape, except to take life. When we use the term 'apparent'—apparent 'danger'—we mean such overt, actual demonstration, by conduct and acts of a design to take life, or to do some great personal injury, as would make the killing apparently necessary to self-preservation. As if A., who had threatened the life of B., presented at him a gun, in a shooting posture, and within range, A. might well anticipate the fire, and if he could kill B., he would be justified, although it turned out afterwards that the gun was not loaded, and it was only intended to frighten him. There was an act done which was apparently dangerous to life, in execution of the threat. This serves to illustrate what is meant by 'apparent' danger. The principle upon this subject is carefully stated by the Chief Justice in *Wesley* v. *State*, 37 Miss. 349. Now, if the excluded testimony had remained for the consideration of the jury, it would have had no influence on the verdict, unless there was testimony that the deceased at the time of the killing sought a deadly conflict with the accused, or was making some demonstration towards the accomplishment of his threat. There were, however, no developments made which could make this testimony pertinent, or entitled to a feather's weight."

The case of the *State* v. *Hays*, 23 Missouri, 287, is instructive on this subject. There certain threats made by the deceased, were offered and excluded by the Court, and the ruling of the Court below was sustained by the Supreme Court. The Judge delivering the opinion of the Court says: "Had Brown, the deceased, attacked Hays, or made efforts to take the advantage of him in personal difficulty, in such a manner as to cause Hays to believe there was reasonable ground to suppose that Brown meant to do him some great bodily harm, and Hays had, to prevent this, killed Brown, then the proof of previous threats by Brown would have been proper and highly important testimony, if recently made and known to him. But such is not this case. *  *  Previous threats are

but words, and words are no justification nor mitigation of murder." To the same effect is the recent case of *Harris* v. *The State of Mississippi*, 47 Miss. 318, in which it was held that "no mere threats by the deceased are admissible on a trial for murder in justification or palliation of the homicide, unless, in addition to such threats, there was also, at the time of the killing, some attempt or demonstration by the deceased, showing a present purpose and immediate danger of carrying such threats into execution or of doing the defendant some great bodily harm. Such threats, to be admissible, must be a part of the *res gestæ.*"

The case of the *State* v. *Hall* is also in point. In that case the Court below instructed the jury as follows: "No threats or menaces, made by the deceased against the defendant D. M. Hall, can avail Hall, unless he at the time of the killing was actually assailed, or had sufficient evidence to convince any reasonable person that he was in danger of incurring bodily injury, or of losing his life at the hands of the deceased. Whatever threats may have been made by the deceased, they cannot be of avail to the defendant, unless at the time of the killing something was done which would induce a reasonable man to suppose that he was in danger of great bodily harm, or of losing his life. All antecedent threats are dependent upon the facts, at the time of the killing; and in order to justify the homicide it must appear that at the time of the killing there was some action which would induce a reasonable man to believe that he was in danger of great bodily harm or of losing his life." (9 Nevada, 59.) And the Supreme Court of Nevada held that the instruction was a proper one. This instruction clearly took from the jury all right to consider the mere threats of the deceased, unaccompanied by any hostile demonstration at the time of the homicide.

*The People* v. *Scoggins*, 37 Cal. 683–4, is substantially to the same effect. "A person whose life has been threatened by another, whom he knows, or has reason to believe, has armed himself for the avowed purpose of taking his life, or inflicting a great personal injury upon him, may reasonably infer, when a hostile meeting occurs, that his adversary intends to carry his threats into execution. The previous

threats alone, however, unless coupled at the time with an apparent design to carry them into effect, will not justify a deadly assault by the other party. There must be such a demonstration of an immediate intention to execute the threat, as to induce a reasonable belief that the party threatened will lose his life, or suffer serious bodily injury unless he immediately defends himself against the attack of his adversary. The philosophy of the law on this point is sufficiently plain. A previous threat alone, and unaccompanied by any immediate demonstration of force at the time of the rencounter, will not justify or excuse an assault, because it may be that the party making the threat had relented or abandoned his purpose, or his courage may have failed, or the threat may have been only idle gasconade, made without any purpose to execute it. On the other hand, if there be at the time such a demonstration of force as would induce a well-founded belief in the mind of a reasonable person that his adversary was on the eve of executing the threat, and that his only means of escape from death or great bodily injury was immediately to defend himself against the impending danger, the law of self-defense would justify him in the use of whatever force was necessary to avert the threatened peril."

The above cases harmonize with that general and well-settled principle of criminal law expressed by Judge Washington in the case of *United States* v. *Wiltberger*, 3 Wash. C. C. 515, in the following language: "A man may oppose force to force in defense of his person, his family, or property against one who manifestly endeavors by surprise or violence to commit a felony, as murder, robbery, or the like. But to justify killing the aggressor, his apparent intent must be to commit a felony. That apparent intent is to be collected from the attending circumstances, the manner of the assault, the nature of the weapon used, and the like, and it must appear that the *danger was imminent* and the species of resistance used necessary to avert it." See, also, *The State* v. *Field*, 14 Maine, 247.

It is contended on behalf of the defendant, that the lives of his mother and sister were in imminent danger from the hands of the deceased at the time the fatal shot was fired.

The evidence shows (and there is no conflict on this point) that defendant and a friend of his were riding on horseback near the deceased, who was also mounted on a horse, and the parties were half a mile distant from the point where defendant's mother and sister then were. The deceased had no weapon that was visible, and in fact had in his possession only a knife, the blade of which was about four inches long. It is true that the evidence shows that the deceased was angry at the time, and that he refused to stop when the defendant called on him to do so, but it is equally true that he exhibited no weapon, and was not riding at a rapid pace in the direction of Reynolds' house, in which defendant's mother and sister were at the time. The deceased received from the defendant a command to halt, and failing to obey such command the defendant twice discharged his revolver at the deceased, one of the shots taking effect in the back, and causing almost instant death. We think, therefore, that the circumstances attending the shooting were not such as to establish a case of justifiable homicide, that there was no case of imminent danger, and that the evidence excluded would not, if the same had been admitted, have justified the killing.

What we have already said, disposes of the exception to the action of the Court in its charge to the jury; and we find no error in the proceedings affecting any substantial right of the defendant. The defendant was convicted simply of manslaughter, with a recommendation to mercy, and the circumstances of the case were not such as to justify a more lenient result.

Judgment and order affirmed.

MYRICK, J., ROSS, J., and McKEE, J., concurred.

SHARPSTEIN, J., dissenting:

On the ninth day of August, 1880, the information upon which the defendant was tried for murder was filed in the Superior Court of San Joaquin county. The homicide was alleged to have been committed on the eighth day of August, 1880, but it was proved to have been committed on the eighth day of August, 1879. The variance between the allegation and proof as to the date of the homicide is material if, as I

think, the defendant could not be proceeded against by information for a felony committed prior to April 9, 1880, when the act to provide for prosecutions by information went into effect. At no time between the eighth day of August, 1879, when the homicide was committed, and the ninth day of April, 1880, when the act above referred to went into effect, could the defendant have been "held to answer for a capital or otherwise infamous crime  *  *  *  unless on presentment or indictment of a Grand Jury." And it is a general rule that a statute affecting rights and liabilities should not be so construed as to act upon those already existing. "But as far as mere modes of procedure are concerned, a party has no more right in a criminal than in a civil action to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place." (Cooley's Const. Lim. 272.) "The Legislature may abolish Courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it can not lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime." (Id.)

That the provision of the late Constitution, which I have quoted, was one of the substantial protections with which that instrument surrounded persons accused of crime can not be doubted. And the Legislature could not, while that provision was in force, dispense with the requirement, that a person before being held to answer for a capital offense, should be presented or indicted by a grand jury. It is, therefore, sufficiently clear that a presentment or indictment of a grand jury was not a mere mode of procedure which the Legislature might in its discretion dispense with or change. That could only be effected by a change in the fundamental law of the State. And that has been so changed as to sanction a proceeding by information in any case in which a proceeding by presentment or indictment of a grand jury was authorized by the late Constitution. So that the real question to be determined is whether the clause of the present Constitution which provides for the prosecution by information of offenses which previously could only be prosecuted by indictment operates retrospectively. "The Courts," says Sedgwick, "re-

fuse to give statutes a retroactive construction, unless the intention is so clear and positive as by no possibility to admit of any other construction." (Stat. and Const. Construction, 2d ed., 166.) And Cooley says, that "it is a sound rule of construction that a statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively." (Const. Lim. 370.)

It must be conceded, I think, that the statute which authorizes the prosecution of a capital crime by information, could not be held to operate retroactively, unless the constitutional provision upon which that statute is based, was intended so to operate. But I am unable to find anything in the statute which indicates a legislative intention that it should operate retrospectively. And there was no reason why it should. The proceeding by indictment was not abolished, and the defendant might have been prosecuted by indictment as well after as before the present Constitution went into effect.

The constitutional provision that "offenses heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, as may be prescribed by law," is not by its terms retrospective. And the provision in section 2, article xxii, that "All indictments or informations which shall have been found, or may hereafter be found, for any crime or offense committed before this Constitution takes effect, may be proceeded upon as if no change had taken place, except as otherwise provided in this Constitution," must be held, I think, to refer to such informations only, as were authorized by the Penal Code to be filed before the Constitution went into effect. The first clause, which reads, "All  *  *  *  informations which shall have been found  *  *  *  for any crime or offense committed before this Constitution takes effect," undoubtedly does. And unless the phrase, " or may hereafter be found" refers to informations other than those referred to in the first clause, it is quite clear that it does not embrace this information.

Informations are not found but filed. That is no less true

of informations authorized by the present Constitution than it was of those which were provided for in the Penal Code before the adoption of the present Constitution. So that the use of the word "found" in connection with "information" possesses no significance beyond what the use of the word "filed" would in that connection.

It will be further observed that this clause provides for *proceedings* to be had upon indictments found or informations filed, for crimes or offenses committed before the Constitution took effect. It does not provide for the *finding* of indictments or *filing* of informations for crimes or offenses committed before it took effect; but for *proceedings* upon them, "as if no change had taken place." If no change had taken place, informations, laid before committing magistrates, might be proceeded upon in the mode prescribed in the Penal Code. And so, might they be after the change took place, as to crimes and offenses committed before the Constitution took effect. But before the Constitution went into effect the defendant could not have been held to answer for the offense with which he is charged without the intervention of a Grand Jury. After it went into effect he could be *proceeded* against upon an indictment or information which had been found or might be found for an offense committed before the Constitution went into effect. He could not have been *tried* upon an information which had been found before the Constitution went into effect, but he might have been *proceeded* against before a committing magistrate upon an information laid before such magistrate, and so he might have been after the Constitution went into effect. He could have been tried upon an indictment after the Constitution went into effect for an offense committed before it went into effect. This appears to me to be the meaning of the Constitution. It certainly does not mean that persons who committed crimes before the Constitution took effect were to be proceeded against in the same manner as they might be if they had committed them after it went into effect; but in the same manner that they might be if it had not been adopted—that is, by information or indictment, as authorized by law before the Constitution took effect.

The defendant's motion for a new trial, on the ground that the verdict was contrary to evidence, should have been granted because of a fatal variance between the proof and the information.

Nor can I assent to the doctrine that the rejection of any competent evidence which tended to prove that the homicide was justifiable, constituted an *immaterial* error, even though this Court cannot discover that the evidence rejected, would in connection with the evidence introduced have established a case of justifiable homicide. The rejection of competent evidence is not a technical error in the sense in which that term is used in *The People* v. *Brotherton*, 47 Cal. 404. In that case it did not appear what the proposed evidence was, and the bill of exceptions omitted to state that it was material. As the record did not contain the rejected evidence, or state its substance, or even state that it was material, this Court would not presume that it was, and, if not material, the rejection of it was at most a technical error. In this case the record does disclose the nature of the testimony offered and rejected. Of its materiality there can be no doubt. It constituted a material element of the defense relied upon. The appellant had a right to have it considered and passed upon by the jury. If with or without that evidence the jury had acquitted him, neither the Court below nor this Court could disturb the verdict on the ground that the evidence was insufficient. (*People* v. *Webb*, 38 Cal. 467.) Wisely or unwisely, the Constitution and the laws of most, if not all the States of this Union, prohibit, so far as laws can, the interference of the courts with facts in criminal cases. They may grant a new trial where the evidence is insufficient to justify a verdict of guilty, but not where it is insufficient to justify a verdict of not guilty. If the evidence rejected had been admitted and the Court had instructed the jury that it was not in connection with the other evidence sufficient to prove the defense of justifiable homicide, this Court would have reversed the judgment without hesitation. Then how can this Court hold that competent evidence upon which the jury might have acquitted the defendant was not material to him?

. If the Constitution and laws of this State afford too much

protection to persons accused of crime, let those who make constitutions and laws change them.

The effort of the defendant was to convince the jury that the deceased intended to kill his, defendant's, mother and sister, or one of them, or to do them or one of them some great bodily injury. For that purpose he introduced evidence tending to prove that at the time of the alleged homicide the deceased was going toward a house at which the defendant's mother and sister were then staying. The appearance of the deceased, his conduct, and what he said on that occasion, were testified to by the defendant and other witnesses. In connection with that testimony the defendant offered to prove that the deceased had made threats against the lives of defendant's said mother and sister. What weight might properly have been given to this evidence was for the jury to determine. It might not be entitled to any, but it was not for the Court to determine whether it was or not. The Court might properly have instructed the jury that bare threats against the life of the defendant, or his mother, or sister, would constitute no justification of the homicide. But the Court could not properly have instructed them that the evidence introduced, in connection with that rejected, would not constitute such justification. Therefore the Court, in rejecting competent testimony on the ground that if admitted it would not constitute a justification of the homicide, as clearly usurped the functions of the jury as if it had admitted the rejected testimony and then instructed the jury that the evidence did not establish a case of justifiable homicide. It would be strange, indeed, if, under our system of jury trials, a Court could exclude all the evidence offered by a defendant on the ground that if it were introduced it would not entitle him to a verdict of acquittal. And that is the ground, and the only ground, upon which the ruling of the Court below, in this case, can be sustained.

In *People* v. *Rector*, 19 Wend. 569–590, Mr. Justice Cowen said: "The jury might have laid no stress upon the circumstance; but I think it should have been received, because we can not say they would not. The lightness of a relevant circumstance is no argument for withholding it from a jury."

(*Rex* v. *Northampton*, 2 Maule & Selw. 262.) The precise point involved in this case has not heretofore, so far as I am informed, been before this Court. In the case of the *People* v. *Arnold*, 15 Cal. 476–481, the Court said: "The threats must be shown to have been communicated to the accused before they are admissible for any purpose. * * * In this case there is no pretense that this threat, if there was any, was so communicated." That case would be an authority upon the question of the admissibility of evidence of *uncommunicated* threats. In this case the threats were *communicated* to the accused.

In *People* v. *Scoggins*, 37 Cal. 676–683, it was held that it was not error to exclude evidence of uncommunicated threats. But the Court significantly added: "If the threats of the deceased had been *communicated* to the defendant before the killing, the evidence would have been clearly competent." The decisions in other States upon this question are not harmonious. But as was said in *Wiggins* v. *People*, 93 U. S. 465–483, the tendency of modern decisions is to admit the evidence of threats made by the deceased and communicated to the prisoner before the killing, even if the other evidence to support the theory of self-defense is slight. In *Stokes* v. *People*, 53 N. Y. 174, the Court held such evidence admissible. Grover, J., who delivered the opinion of the Court, said: "I think the testimony offered competent and the exception to its exclusion well taken. The error was one prejudicial to the accused, by depriving him of the right to have competent testimony in his favor considered by the jury, and can not be overlooked by the Court."

In Texas, Tennessee, and Georgia, the exclusion of such evidence has been held to be error, without reference to the question whether there was any evidence tending to show that at the time of the killing the deceased was doing anything to indicate an intention of putting his threats into execution, it being the exclusive province of the jury to determine whether he was or not. (*Pridgen* v. *The State*, 31 Tex. 420; *Jackson* v. *The State*, 6 Bax. 452; *Howell* v. *The State*, 5 Ga. 48; *Monroe* v. *The State*, id. 85.) In the Georgia cases, the Court said: "That naked threats, unaccompanied with personal violence, were admissible to show the reason-

ableness of the defendant's fears, provided a knowledge of the threats was brought home to him."

For these reasons I think that the judgment and order of the Court below should be reversed.

McKINSTRY, J., and THORNTON, J., concurred in the opinion of SHARPSTEIN, J.